**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Daniel S. Guerra (State Bar No. 267559)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
        dguerra@bursor.com
        sbogdanovich@bursor.com

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANNA BUCHHOLZ, individually and on behalf of all other persons similarly situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>LEAN RX, INC., META PLATFORMS, INC., and GOOGLE LLC,<br><br>                  Defendants. | Case No.<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiff Anna Buchholz ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendants, Lean Rx, Inc. ("LeanRx"), Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook"), and Google LLC ("Google") (collectively, "Defendants").  Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of individuals who purchased prescription weight loss medications through the https://skinnyrx.com website ("SkinnyRx" or the "Website") and had their prescription drug names, first and last names, email addresses, and other digital identifiers disclosed to Facebook and Google, in violation of various California state and federal privacy laws.

2.    Defendant LeanRx owns and operates SkinnyRx. Defendant installed various tracking technologies on the Website to permit Facebook and Google to intercept, in real time, which specific prescription drugs Website visitors were purchasing on the Website. Worse still, both Facebook and Google also collect personal information—including first and last names, email addresses, IP addresses, and Facebook ID numbers—to determine *which* particular Website visitor was buying *which* particular drug. Google and Facebook would read and review this information in real-time, and, within a  matter of minutes, begin sending those very same Website users targeted advertisements for other weight loss drugs on other online platforms like Facebook, Instagram, or Google search.

3.    By installing these tracking technologies on its Website for the purpose for improving its own targeted advertising efforts, Defendant LeanRx aided, employed, agreed with, and/or conspired with Defendants Facebook and Google and other third-party vendors to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected medical information.  Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.  By failing to procure consent before enabling

Defendant Facebook's and Defendant Google's interception of these communications, and by disclosing such information to Defendants Facebook and Google, Defendant LeanRx violated the California Invasion of Privacy Act ("CIPA"), CAL. PENAL CODE §§ 631-632; Invasion of Privacy and Violation of the California Constitution, ART. 1, § 1, and the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 25198 *et seq*.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the Nationwide Class and the California Class, and there is minimal diversity.

5.      The Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 since this suit is brought under the laws of the United States, *i.e.*, Electronic Communications Privacy Act, 18 U.S.C. § 25198 *et seq*., and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining state common law and statutory claims as these state law claims are part of the same case or controversy as the federal statutory claim over which the Court has original jurisdiction.

6.      The Court has personal jurisdiction over Defendant LeanRx because, on information and belief, Defendant LeanRx has purposefully directed its activities to the Northern District of California by regularly engaging with individuals in California including through the Website. Defendant LeanRx's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant LeanRx's contact with the forum, Plaintiff would not have suffered harm.

7.      The Court has general personal jurisdiction over Defendant Facebook because Facebook resides in and does business in the State of California, with its principal place of business in Menlo Park, California.  Additionally, Facebook is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in this State.

8.      The Court has general personal jurisdiction over Defendant Google because Google resides in and does business in the State of California, with its principal place of business in Mountain View, California.  Additionally, Google is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in this State.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (1) Defendant Facebook resides in this District; (2) Defendant Google resides in this District; (3) Defendants are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District; (4) Defendants do substantial business within this District; (5) Plaintiff resides in this District; and (6) the injury to Plaintiff occurred within this District.

### THE PARTIES

***Plaintiff***

10.     Plaintiff Anna Buchholz is an adult citizen of the state of California and is domiciled in Marina, California.

11.     Plaintiff has used the Website since 2025.  Plaintiff first accessed the Website from her iPhone in early September 2025 to research weight loss treatments.  On September 10, 2025 and October 1, 2025, Plaintiff ordered weight loss medications from Defendant's Website. Because Plaintiff has accessed the Website to order weight loss medications, and because of Defendant's actions as alleged herein, Plaintiff's use of the Website has led to the unlawful interception of private and personally identifiable information, including information regarding her medical condition, history, or treatment.  Specifically, as a result of Defendant's unlawful conduct as alleged herein, third parties, including Facebook and Google, intercepted information about the prescription medications Plaintiff ordered through the Website —namely, prescriptions for Semaglutide and Semaglutide Tablets.  As a result of Defendant's unlawful conduct, Plaintiff received digital advertisements related to the prescriptions she previously ordered on Defendant's Website.  For example, after ordering prescriptions for Semaglutide, Plaintiff received advertisements relating to weight loss medications and hormone treatments.

12.    Plaintiff has active Facebook and Instagram accounts which she has maintained for over ten years.  Plaintiff also has an active TikTok accounts which she has maintained for almost two years.  During that time, Plaintiff has routinely logged onto her Facebook, Instagram, and TikTok accounts on the same device she has used to access Defendant's Website.

13.    Pursuant to the systematic process described herein, Defendant LeanRx assisted third parties, including Defendants Facebook and Google, with intercepting Plaintiff's communications, including those that contained personally identifiable information, protected health information, and related confidential information.  Defendant LeanRx assisted these interceptions by Facebook, Google, and other third parties without Plaintiff's knowledge, consent, or express written authorization.

14.    By failing to receive the requisite consent, Defendant LeanRx breached its duties of confidentiality and unlawfully disclosed Plaintiff's personally-identifiable information ("PII") and protected health information ("PHI").

15.    By intercepting Plaintiff's communications, including those that contained personally identifiable information and protected health information, without receiving the requisite consent, Defendants Facebook and Google unlawfully violated Plaintiff's right to privacy.

**_Defendants_**

16.    Defendant Lean Rx, Inc. is incorporated in the State of Delaware. Although its principal place of business is 2542 Curtis Street, East Elmhurst, NY, 11369, LeanRx owns and operates its weight-loss focused Website that connects consumers with their "team of board-certified weight loss doctors" to "create personalized weight loss plans tailored specifically to [consumers'] health, nutrition, preferences, and lifestyle."[1]  These plans include "100% online doctors visits and prescriptions" that allow for the "overnight delivery" of prescription obesity medications such as "Ozempic, Wegovy, Zepbound, and other [compounded] GLP-1s." Consumers enter their personal information into the Website as the first of three easy steps to

---

[1] SkinnyRX, Terms and Conditions, https://skinnyrx.com/terms.

loosing "up to 14.9% of [their] body weight."[2]  Then, once a "SkinnyRx licensed medical

provider" has reviewed consumers' "intake form[s] after checkout to confirm [their] eligibility,"

the prescribed medication is shipped overnight directly to consumers.[3]

17.    Defendant Meta Platforms, Inc. is a Delaware corporation with principal executive

offices located at 1 Meta Way, Menlo Park, California 94025.  Facebook is a social media platform

that—as the chart below illustrates—"generate[s] substantially all of [its] revenue from selling

advertising placements … to marketers."[4]

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
| --- | --- | --- | --- |
| 2024 | $164.501 billion | $160.633 billion | 97.65% |
| 2023 | $134.902 billion | $131.948 billion | 97.81% |
| 2022 | $116.609 billion | $113.642 billion | 97.46% |

18.    As one of the largest advertisers in the nation, Facebook knew that the data it

received from LeanRx through the Facebook Pixel (the "Facebook Pixel") contained intimate

health data.  Despite knowing this, Facebook continued to receive, analyze, and use this

information for its own purposes, including marketing and data analytics.

19.    Defendant Google, LLC is a Delaware limited liability company with principal

executive offices located at 1600 Amphitheatre Parkway, Mountain View, California 94043.

Google is an advertising company that "generates revenues primarily by delivering both

performance and brand advertising that appears on Google Search & other properties, YouTube,

and Google Network partners' properties ("Google Network properties"). [Google] continue[s] to

invest in both performance and brand advertising and seek to improve the measurability of

---

[2] *Id.*

[3] *Id.*

[4] Facebook, Inc. SEC Form 10-K for fiscal year ended December 31, 2024,
https://www.sec.gov/Archives/edgar/data/1326801/000132680125000017/meta-20241231.htm.

advertising so advertisers understand the effectiveness of their campaigns."[5]  In 2024, Google generated $264.59 billion in advertising revenue, which amounted to more than 75 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in 2023:[6]

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|--------------|-----------|--------------|
| 2024 | $350.018 billion | $264.590 billion | 75.59% |
| 2023 | $307.394 billion | $237.855 billion | 77.38% |

20.    As one of the largest advertisers and data analytics companies in the country, Google knew that the data it received from LeanRx through Google Analytics, Google Tag Manager, and DoubleClick (the "Google Trackers") contained intimate health data.  Despite knowing this, Google continued to receive, analyze, and use this information for its own purposes, including marketing and data analytics.

## **FACTUAL ALLEGATIONS**

### A.    **Background of the California Information Privacy Act**

21.    Enacted in 1967, CIPA, Cal. Penal Code § 630, *et seq.*, is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications.  The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

22.    CIPA prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message,

---

[5] Alphabet, Inc. SEC Form 10-K for fiscal year ended December 31, 2024, https://www.sec.gov/Archives/edgar/data/1652044/000165204425000014/goog-20241231.htm.
[6] *Id.*

report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

23.    To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

24.    Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email.  *See Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*., 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

25.     Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights.  Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III.  *See Campbell v. Facebook, Inc.*, 2020 WL 1023350; *In re Facebook Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020).

26.     Under Cal. Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**B.      Background of the Electronic Communications Privacy Act**

27.     In a manner similar to CIPA, the federal Electronic Communications Privacy Act of 1986 (*i.e.*, the ECPA, or the Wiretap Act) creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."  *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).

28.     Although the ECPA does not apply "where one parties to the communication has given consent[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."  18 U.S.C. § 2511(d).

**C.      Defendant LeanRx's Website**

29.     LeanRx owns and operates its weight-loss focused Website, skinnyrx.com, that sells consumers weight loss medications.  The Website also refers consumers to affiliated doctors to obtain prescriptions for prescription-only obesity medications such as Ozempic, Wegovy, and Zepbound.  "Once you complete the health intake quiz, a licensed clinician will review your information. Depending on your health needs, you may either have a video call with a doctor or **receive a prescription directly within 24 hours.**"[7] (emphasis in original).

30.     When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[8]

---

[7] Skinnyrx.com

[8] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that

31.     Often times, third-party scripts are installed on websites "for advertising purposes."[9]

32.     Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[10]

33.     Defendant LeanRx has incorporated the Defendants Facebook and Google Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website caused the Facebook Pixel and the Google Trackers (collectively, the "Trackers") to be installed on Plaintiff's and other users' browsers.

34.     As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser. This allows Facebook and Google, through their respective Trackers, to collect Plaintiff's and Class Members' PII and PHI and to pervasively track them across the Internet.

35.     Defendants Facebook and Google then use the information of Website visitors that is collected by the Trackers, including that of Plaintiff and Class Members, to identify Plaintiff and Class Members, serve targeted advertisements, and unjustly enrich themselves through this improperly collected information.

36.     At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

D.     **Facebook's Platform and its Business Tools**

37.     Defendant Facebook describes itself as a "real identity platform,"[11] meaning users

---

are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[9] *Id.*

[10] *Id.*

[11] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

are allowed only one account and must share "the name they go by in everyday life."[12]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[13]

38.     In 2024, Facebook generated $160.633 billion in revenue.[14]  With respect to the apps offered by Facebook, substantially all of Facebook's revenue is generated by selling advertising space.[15]

39.     Facebook sells advertising space by highlighting its ability to target users.[16] Facebook can target users so effectively because it surveils user activity both on and off its site.[17] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[18]  Facebook compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[19]

40.     Advertisers can also build "Custom Audiences."[20]  Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[21]  With Custom

---

[12] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[13] FACEBOOK, SIGN UP, https://www.facebook.com/.

[14] Facebook, Inc. SEC Form 10-K for fiscal year ended December 31, 2024, https://www.sec.gov/Archives/edgar/data/1326801/000132680125000017/meta-20241231.htm.

[15] Id.

[16] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[17] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[18] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[19] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[20] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[21] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[22]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[23]

41.  As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[24]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

42.  The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[25]  Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers can

---

[22] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[23] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook, Create a Website Custom Audience, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[24] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[25] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

---

choose, including what content a visitor views or purchases.[26]  Advertisers can even create their

own tracking parameters by building a "custom event."[27]

43.    One such Business Tool is the Facebook Pixel.  Facebook offers this piece of code

to advertisers, like Defendant LeanRx, to integrate into its website.  The Facebook Pixel "tracks the

people and type of actions they take."[28]  When a user accesses a website hosting the Facebook

Pixel, Facebook's software script surreptitiously directs the user's browser to contemporaneously

send a separate message to Facebook's servers.  This second, secret transmission contains the

original GET request sent to the host website, along with additional data that the Facebook Pixel is

configured to collect.  This transmission is initiated by Facebook code and concurrent with the

communications with the host website.  At relevant times, two sets of code are thus automatically

run as part of the browser's attempt to load and read Defendant LeanRx's Website—Defendant

LeanRx's own code, and Facebook's embedded code.

44.    Defendant LeanRx chose to include the Facebook Pixel on its Website.

45.    Facebook's own documentation makes clear just how much tracking of private

information the Facebook Pixel does.  It describes the Facebook Pixel as code that Facebook's

business customers can put on their website to "[m]ake sure your ads are shown to the right people.

***Find … people who have visited a specific page or taken a desired action on your website***."

(Emphasis added.).[29]

46.    Facebook instructs such business customers that:

> Once you've set up the [Facebook Tracking] Pixel, ***the pixel will log when
> someone takes an action on your website***.  Examples of actions include
> adding an item to their shopping cart or making a purchase.  ***The Pixel***

---

[26] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[27] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also*
FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[28] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[29] Meta, ABOUT META PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited
Dec. 26, 2023).

*receives these actions, or events*, which you can view on your [Facebook Tracking] Pixel page in Events Manager.  From there, you'll be able to see the actions that your customers take.  *You'll also have options to reach those customers again through future Meta ads*.[30]

47.    Of course, in healthcare, it is medications and medical specialists that users "add to their shopping cart."  Patients order medications and make doctor's appointments related to those medications.

48.    The Facebook Pixel code enables Facebook not only to help Defendant LeanRx with advertising to its own patients outside the Website, but also include individual patients among groups targeted by *other* Facebook advertisers relating to the conditions about which patients communicated on Defendant LeanRx's Website.

49.    Facebook's Business Help Center explains:

Meta *uses marketing data to show ads to people who are likely to be interested in them*.  One type of marketing data is website events, which are *actions that people take on your website*.[31]

50.    In other words, Facebook sells advertising space by highlighting its ability to target users.[32]  Facebook can target users so effectively because it surveils user activity both on and off its site.[33]  This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and connections.[34]

51.    An example illustrates how the Facebook Pixel works.  Take an individual who navigates to Defendant LeanRx's website and clicks on the link for "Weight Loss."  When that "Weight Loss" link is clicked, the individual's browser sends a GET request to Defendant

---

[30] *Id.* (Emphasis added.)

[31] Meta, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).

[32] Meta, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706 (last visited Dec. 26, 2023).

[33] Meta, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[34] Meta, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

---

LeanRx's server requesting that server to load the particular webpage.  Because LeanRx utilizes the Facebook Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening.  Facebook causes the browser to secretly duplicate the communication with LeanRx, transmitting it to Facebook's servers, alongside additional information that transcribes the communication's content and the individual's identity.

52.    Contemporaneously with collecting and intercepting the information described in the preceding paragraph, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

**E.    Google's Platform and its Business Tools**

53.    Defendant Google offers a range of advertising software, one of which is called Google Analytics.

54.    "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights" for businesses.[35]  This is made possible by the Google Analytics Pixel, a piece of code installed on a website that collects information on how website users interact with a business's website, such as "how many users bought an item … by tracking whether they made it to the purchase-confirmation page."[36]

55.    Google advertises this service can "[m]onitor activity on your site as it happens."[37]

56.    Google's business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the Google Analytics Pixel.

57.    Thus, through websites that employ Google's services, Google directly receives the electronic communications of website visitors entered into websites via website features like search bars.

---

[35] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447?hl=en&ref_topic=14089939&sjid=2827624563183915220-NC.

[36] *Id.*

[37] GOOGLE, THE FINER POINTS, https://marketingplatform.google.com/about/analytics/features/.

1    58.    That information is then analyzed by Google before being provided to any entity

2    that was a party to the conversation (like Defendant LeanRx).

3    59.    Once Google intercepts website communications, it has the capability to use such

4    information for its own purposes. "Google uses the information shared by sites and apps to deliver

5    [] services, maintain and improve them, develop new services, measure the effectiveness of

6    advertising, protect against fraud and abuse, and personalize content and ads you see on Google

7    and on [] partners' sites and apps."[38]

8    60.    Google's range of software services is based on Google's ability to collect and

9    analyze information about consumers' web behavior and deliver targeted advertising to select

10   consumers based on their web habits.  This involves collecting visitor information from thousands

11   of websites and then analyzing that information in order to deliver targeted advertising and group

12   web users so that they can be targeted for products and categories they are interested in.

13   61.    Information from websites, like Defendant LeanRx's Website, is central to Google's

14   ability to successfully market their advertising capabilities to future clients.

15   62.    In sum, Google has the capability to use website communications to: (i) improve its

16   own products and services; (ii) develop new Google for Business and Google Analytics products

17   and services; and (iii) analyze website visitors' communications to assist with and data analytics

18   and targeted advertising.

19   63.    Further, Defendant LeanRx shares information with Google that amounts to

20   personally identifiable information via its collection of device identifiers and IP addresses.  Device

21   identifiers and IP addresses are types of information that the U.S. Department of Health and

22   Human Services lists as information that should be removed to de-identify a patient in compliance

23   with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").[39]  Google uses

24

25   ---

[38] GOOGLE, GOOGLE PRIVACY AND TERMS, https://policies.google.com/technologies/partner-sites.

26   [39] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, GUIDANCE REGARDING METHODS FOR DE-
     IDENTIFICATION OF PROTECTED HEALTH INFORMATION IN ACCORDANCE WITH THE HEALTH

27   INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA) PRIVACY RULE, https://www.hhs.
     gov/ hipaa/for-professionals/privacy/special-topics/de-identification/index.html#standard.

28

IP addresses and unique device identifiers to track internet users.  Therefore, Defendant is disclosing both PHI and PII to Google as described in the section below.

64.     Yet another type of personally identifiable information obtained from Website users by Google is what data companies refer to as a "browser-fingerprint."  A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

65.     These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.  As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[40] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[41]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[42]

66.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users. [43]

67.     Browser-fingerprints are personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

68.     Defendant LeanRx uses and causes the disclosure of data sufficient for third parties, like Defendant Google, to create a browser-fingerprint identifier with each re-directed communication described herein, including health intake forms and patient communications concerning doctor appointments and prescription medications.

---

[40] GOOGLE, BUILDING A MORE PRIVATE WEB, https://www.blog.google/products/chrome/building-a-more-private-web/.

[41] Chris Hauk, *What is Browswer Fingerprinting? How it Works and How to Stop it*, https://pixelprivacy.com/resources/browser-fingerprinting/.

[42] *Supra* note 37.

[43] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features*, https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

**F.      How Defendant LeanRx Disclosed Plaintiff's and Class Members' Protected Health Information And Assisted Defendants Facebook and Google With Intercepting Communications**

69.      Through Defendants' Facebook Pixel and Google Analytics, among other third-party trackers, Defendant LeanRx assisted Defendants Facebook and Google and others with intercepting the identities and online activity of Defendant LeanRx's users, including information related to the type of medication patients were seeking and for which they booked appointments.

70.      When a user enters https://skinnyrx.com, they are able to click the "Get started" button on the Website's landing page to provide medical information as part of the intake process that must be completed before being allowed to order obesity medication.  *See* Figure 1.

<u>**Figure 1**</u>



71.      After entering medical information and finishing the intake process, the user is directed to a page on Defendant's Website where they can choose the obesity medication they want to purchase.  *See* Figure 2.  The Facebook Pixel automatically detects when a user clicks on the "Choose my medication" button.  *See* Figure 3.

**Figure 2**



**Figure 3**



72.     Due to the integration of the Facebook Pixel on the Website, Defendant Facebook is

able to intercept the information about the Website page the user reached.  This information

includes the description of the type of medication the user is seeking, which is included in the

URL.  For example, if a user selects the medication "Tirzepatide Tablets" and proceeds to check

out, they will be taken to the Website page with the URL: https://skinnyrx.com/checkout-

bundle?alt=t9&checkout_product_id=tirzepatide_tablet&checkout_sub_product_id=null. *See*

Figure 4.  When Facebook intercepts this communication due to Defendant LeanRx's integration of

the Facebook Pixel, Facebook effectively intercepts the medication the patient searched for. *See*

*id.*; Figure 5.

<u>**Figure 4**</u>



1

2

3

4

5

6

7

8

9

10

11

**Figure 5**



12    73.    Each time Defendant Facebook intercepts this activity data via the Facebook Pixel

13   integrated into the Website by Defendant, it also intercepts a patient's personally identifiable

14   information, including their Facebook ID ("FID").  A FID is a unique and persistent identifier that

15   Facebook assigns to each user.  With it, anyone ordinary person can look up the user's Facebook

16   profile and name.  Notably, while Facebook can easily identify any individual on its Facebook

17   platform with only their unique FID, so too can any ordinary person who comes into possession of

18   an FID.  Facebook admits as much on its website.  Indeed, ordinary people who come into

19   possession of the FID can connect to any Facebook profile.

20    74.    A user who accesses Defendant LeanRx's Website while logged into Facebook will

21   transmit the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID.  *See*

22   Figures 6, 7.

23

24

25

26

27

28

**Figure 6**



**Figure 7**

75.    When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies.

76.    One such cookie is the "fr cookie" which contains, at least, an encrypted Facebook ID and browser identifier.[44] *See* Figure 7, *supra*.  Facebook, at a minimum, uses the fr cookie to identify users. [45]

---

[44] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[45] FACEBOOK, PRIVACY CENTER–COOKIES POLICY, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3.

77.    If a visitor has never created an account, an even smaller set of cookies are transmitted.

78.    At each stage, Defendant also utilizes the "_fbp cookie", which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.[46]

79.    The c_user cookie expires after 90 days if the user checked the "keep me logged in" checkbox on the website.[47]  Otherwise, the c_user cookie is cleared when the browser exits.[48]

80.    The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[49]  If that happens, the time resets, and another 90 days begins to accrue.[50]

81.    The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[51]  If that happens, the time resets, and another 90 days begins to accrue.[52]

82.    The Facebook Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, LeanRx's Website.[53]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[54]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

---

[46] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[47] Seralthan, FACEBOOK COOKIES ANALYSIS (Mar. 14, 2019), https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a.

[48] *Id.*

[49] *See id.*

[50] Confirmable through developer tools.

[51] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[52] Also confirmable through developer tools.

[53] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[54] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

83.     Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.  Defendant LeanRx sent these identifiers alongside the event data.

84.     Defendant LeanRx's integration of the Google Analytics Pixel similarly allows Google to intercept information about: (1) the medication the user is attempting to buy; (2) the user's date of birth, name, and shipping address; and (3) user's IP addresses and device identifiers that could be used for digital fingerprinting purposes.

**Figure 8**



**Figure 9**



| × | Headers | Payload | Preview | Response | Initiator | Timing | Cookies |

▼ Query String Parameters  [ View source ]  [ View URL-encoded ]

| random | 1761176338169 |
| cv | 11 |
| fst | 1761176338169 |
| bg | ffffff |
| guid | ON |
| async | 1 |
| en | begin_checkout |
| gtm | 45be5al1v9108197149za200zb9194271552zd9194271552zec |
| gcd | 13l3l3R3l5l1 |
| dma | 0 |
| tag_exp | 101509157~103116026~103200004~103233427~104527906~104528500~10468420 8~104684211~104948813~115480710~115938465~115938468 |
| u_w | 1920 |
| u_h | 1080 |
| url | https://skinnyrx.com/checkout-bundle?checkout_product_id=tirzepatide_tablet&chec kout_sub_product_id=null |
| ref | https://skinnyrx.com/results-bundle?entry_source=unknown&entrySource=unknown &dob=07%2F12%2F1992&email=sbogdanovich%40bursor.com&agree=true&addre ss=1990+N+California+Blvd&address2=1990+N+California+Blvd&city=Walnut+Cre ek&state=CA&zipCode=94596&firstName=Stefan&lastName=Bogdanovic&phone =%28925%29+300-4455&selectedProduct=tirzepatide_tablet&currentWeight=300 |
| frm | 0 |
| tiba | SkinnyRx |
| value | 299 |
| currency_code | USD |
| hn | www.googleadservices.com |

85.     Additionally, Defendant LeanRx's integration of the Google Analytics Pixel, among other third-party technologies, allows Google and others to create a browser-fingerprint identifier with each re-directed communication described herein, including information on the medications a user purchases.

86.     Plaintiff used Defendant LeanRx's Website to learn about obesity medications and to purchase obesity medications.  Plaintiff never consented, agreed, authorized, or otherwise

permitted Defendant to disclose her personally identifiable information and protected health information.  Plaintiff was never provided with any written notice that Defendant LeanRx integrated code into its Website that allowed third parties to intercept Website users' PHI, nor was she provided any means of opting out of such disclosures.

**G.    By Synthesizing and Organizing Data Collected From Multiple Webpages In Real Time, Facebook And Google "read, attempt to read, or learn," The Contents of Communications.**

87.    The Facebook and Google Tracking Pixels do not simply record users' interactions on particular websites. Instead, *instantaneously and in real time*, the code of these pixels read, or, at the very least, attempt to read, the user's interaction on the website, *classifies* that interaction as certain type of event, and *organizes* that communication with prior communications the user had on different webpages. In so doing, these codes are actively learning the communication and are attempting to profile the website user.

88.    In other words, each transmission between the Website and Facebook and Google are not distinct and independent events. Instead, they build on top of each other, allowing Facebook and Google to stitch together multiple interactions from multiple webpages to obtain a more complete picture of the user's interaction.

89.    A user's typical checkout process on SkinnyRx illustrates this point.

90.    When a user goes to purchase weight-loss medication on the Website, they are prompted to hit a "Get Started" button. *See* Figure 10, next page. After that, users are prompted to input their contact information, including their first and last name, phone number, address, and email address. *See* Figures 11 and 12.

**Figure 10**



**Figure 11**



**Figure 12**



91.     As this is occurring, both Facebook and Google are intercepting the answers to the prompts that users are communicating to the Website. Once the user clicked the Get Started button on Figure 10, both Facebook's Advanced Matching and Google's Enhanced Conversions were activated.

**Figure 13**



92.     The Website also uses "Advanced Matching."  When activated, the Facebook Tracking Pixel will "look for recognizable form field and other sources on your website that contain information such as first name, last name and email." [55]

93.     Defendant LeanRx discloses this information so it can better match visitors to their Facebook profiles, which thereby allows LeanRx to better track analytics and target its advertisements.

**Figure 14**

You can use Advanced Matching to help:

- Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.

- Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.

- Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

94.     In other words, Facebook is not merely collecting data. Facebook is actively interpreting the data it is receiving to "match more of the conversions that happen on your website to people" to "help[] you understand," what they are doing. *See* Figure 14.

95.     Defendant's Facebook Tracking Pixel is configured to scan form fields containing a user's email, first name, last name, address, and other identifying information:[56]

---

[55] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[56] Facebook provides a corresponding look-up table: FACEBOOK, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching.

**Figure 15**



96.     The Website's Google tracking pixel also captures a user's personal information using "Enhanced Conversions."[57] *See* Figure 15. "With enhanced conversions for web, first-party customer data such as an email address, name, home address, or phone number is captured in your conversion tracking tags, hashed, sent to Google in its hashed form, and then *used to match* your customers to Google accounts."[58] As Google explains, this "[i]*mproves measurement* of online conversions" and is "[r]evelant for advertisers who want to track sales and events that happen on a website."[59]

97.     SkinnyRx's Google tracking pixel is also configured to scan form fields containing a user's email, first name, and last name, address, and another identifying information:

---

[57] GOOGLE, ABOUT ENHANCED CONVERSIONS, https://support.google.com/google-ads/answer/15712870?sjid=17657377142248492426-NC.

[58] *Id.*

[59] *Id.*

**Figure 16**





```
f(a, "email", tw);
f(a, "phone_number", uw);
f(a, "first_name", h(vw));
f(a, "last_name", h(vw));
var n = a.home_address || {};
f(n, "street", h(ww));
f(n, "city", h(ww));
f(n, "postal_code", h(xw));
f(n, "region", h(ww));
f(n, "country", h(xw));
for (var p = sb(a.address || {}), q = 0; q < p.length; q++) {
    var r = p[q];
    g(r, "first_name", vw, q);
    g(r, "last_name", vw, q);
    g(r, "street", ww, q);
    g(r, "city", ww, q);
    g(r, "postal_code", xw, q);
    g(r, "region", ww, q);
    g(r, "country", xw, q)
```

98.     After the user completes inputting their personal information on SkinnyRx and clicks the continue button on Figure 12, they are taken to another webpage where they can then begin shopping for various weight-loss drugs. *See* Figure 17, next page.

1

**Figure 17**



99.     Once a user selects the particular drug and clicks the "Proceed to checkout" button, both Facebook and Google tracking pixels instantaneously not only collect the fact that particular drug was selected, but also *match* that drug selection with the personally identifiable information that was previously collected from the user during sign up. *See* Figure 18-20, next two pages.

**Figure 18**



100.   As Figure 18 above illustrates, not only is Google learning that the "selectedProduct=tirzepatide_tablet", but also that this drug is associated with an individual by the "firstName=Stefan&lastName=Bogdanovich." That information was not provided by the user nor did it appear on the prior screen depicted in Figure 17. Rather, that information came from the information the user previously communicated in Figure 10, and the Google tracking pixel *synthesized* and associated that information.  In other words, Google was not merely recording the user's session and replaying it; rather, Google was intercepting multiple pieces of information captured at different points in time and synthesizing it in real time to, in Google's own words, "*use[] [it] to match* your customers" and "[i]*mprove[] [the] measurement* of online conversions."[60]

101.   What is more, the screenshot illustrates that Google has read, or attempted to read, the communication and summarized and organized the data into what it believed was important. For example, it noted that this event was a "begin_checkout" and that the "value" of item selected was "299" and that the "currency_code" was in "USD." *See* Figure 18.

---

[60] *Id.*

**Figure 19**



**Figure 20**

102.     Similarly, in Facebook's case, Facebook has likewise parsed the data noted that the event was "InitiateCheckout" and that the "checkout_product_id=tirzepatide_tablet." Figures 19 and 20. It has also matched that information with the users' "c_user" cookie, which contains the user's Facebook ID and is likewise used the match the individual. Figure 20.

**H.      Facebook and Google Use the Information They Learned About SkinnyRx Users To Send Those Users Targeted Advertisements.**

103.     As both Facebook and Google note, the point of these technologies match specific users' interactions online so that future online advertising campaigns will more efficiently retarget those same users. And here it does just that. Within minutes after selecting their weight-loss drugs from SkinnyRx, and before any purchase is completed, users can begin receiving targeted advertisements for other weight loss drugs when using other online platforms like Facebook or Instagram, from other personal devices, like their smartphone. *See, e.g.*, Figures 21-23.

| **Figure 21** | **Figure 22** | **Figure 23** |
| --- | --- | --- |

  

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**I.    Defendant LeanRx Violates Federal Law By Installing Tracking Codes On Its Healthcare Website.**

104.    On the bottom footer of the Website, Defendant LeanRx claims to be "HIPAA compliant."  *See* Figure 24.

**<u>Figure 24</u>**



105.    It is anything but. By law, Plaintiff is entitled to privacy in her PHI and confidential communications.  Defendant LeanRx deprived Plaintiff of her privacy rights when it: (1) implemented a system that surreptitiously allowed third parties, including Defendants Facebook and Google, to track, record, and intercept Plaintiff's and other online patients' confidential communications, personally identifiable information, and PHI; and (2) undertook this pattern of conduct without notifying Plaintiff and without obtaining her express written consent.  Plaintiff did not discover that Defendant engaged in the unlawful conduct alleged herein until October of 2025.

106.    The government has issued guidance warning that tracking code like the Facebook Pixel may violate federal privacy law when installed on healthcare-related websites such as Defendant LeanRx's.  The statement titled, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the "Bulletin"), was issued by the Department of Health and Human Services' Office for Civil Rights ("OCR") in December 2022.[61]

107.    Health care organizations and their business associates regulated under the HIPAA may use third-party tracking tools, such as the Facebook Pixel, in a limited way, to perform analysis on data key to operations.  They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors.  The Bulletin explains:

---

[61] HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[62]

108.    The bulletin discusses the types of harm that disclosure may cause to the patient:

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI***. Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment***. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[63]

109.    Plaintiff and Class Members face just the risks about which the government expresses concern. Defendant LeanRx's unlawful conduct resulted in Defendants Facebook and Google and other third parties intercepting information supplied during the health intake process as well as information regarding Plaintiff's and Class Members' purchase of obesity medications and the booking of related doctor appointments on Defendant LeanRx's Website. This information is, as described by the OCR in its bulletin, "highly sensitive."

110.    The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, ***or any unique identifying code***.[64]

---

[62] *Id.* (Emphasis added.)

[63] *Id.* (Emphasis added.)

[64] *Id*. (Emphasis added.)

111.    Crucially, that paragraph in the government's Bulletin continues:

*All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.* This is because, *when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.*[65]

112.    Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

"When consumers visit a [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook

---

[65] *Id*. (Emphasis added.)

pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.

… Through its recent enforcement actions against BetterHelp, GoodRx and Premom, as well as recent guidance from the FTC's Office of Technology, the FTC has put companies on notice that they must monitor the flow of health information to third parties that use tracking technologies integrated into websites and apps. The unauthorized disclosure of such information may violate the FTC Act and could constitute a breach of security under the FTC's Health Breach Notification Rule … [66]

Therefore, Defendant LeanRx's conduct is directly contrary to clear pronouncements by the FTC and HHS.

113.    In light of, and in addition to, the government's own issued guidance above, news sources are also warning that tracking code, like the Facebook Pixel, poses risks of violating federal privacy law and HIPAA:

Federal regulators are warning [regulated entities] and telehealth providers about the data privacy risks of using third-party tracking technologies.

These services, like [Facebook Tracking] Pixel or Google Analytics, could violate the Health Insurance Portability and Accountability Act (HIPAA) or Federal Trade Commission (FTC) data security rules, officials said.

The FTC and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) issued a rare joint release announcing that 130 [regulated entities] and telehealth providers received a letter warning them about the data privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps … "The compliance buck still stops with you. Furthermore, your company is legally

---

[66] Federal Trade Commission, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

responsible even if you don't use the data obtained through tracking technologies for marketing purposes."[67]

Fierce Healthcare also spoke up in an April 3, 2023 article:

> Nearly all nonfederal acute care hospitals' [regulated entities'] websites track and transfer data to a third party, potentially fueling the unwanted disclosures of patients' sensitive health information and opening up that [regulated entity] hospital to legal liability, according to a recently published University of Pennsylvania analysis. [https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2022.01205]. The census of more than 3,700 hospital [regulated entity] homepages found at least one third-party data transfer among 98.6% of the websites as well as at least one third-party cookie on 94.3%, researchers wrote in Health Affairs.
>
> The hospitals' [regulated entities'] homepages had a median of 16 third-party transfers, more of which were found among medium-sized (100 to 499 beds) hospitals, nonprofit hospitals, urban hospitals, health system-affiliated hospitals and those that weren't serving the largest portion of patients in poverty, they wrote … Many of these complaints cite Facebook parent company Meta's Pixel tracker, which a June 2022 investigation from The Markup [https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites] detected on about a third of large hospitals' websites. That report found evidence that, in some instances, the sensitive data transferred to third parties met the criteria for a HIPAA violation.[68]

Health Affairs also published an article in April 2023, stating:

> By including third-party tracking code on their websites, [regulated entities] are facilitating the profiling of their patients by third parties. These practices can lead to dignitary harms, which occur when third parties gain access to sensitive health information that a person would not wish to share. These practices may also lead to increased health-related advertising that targets patients, as well as to legal liability for hospitals [regulated entities].[69]

---

[67] Heather Landi, *Regulators warn hospitals and telehealth companies about privacy risks of Meta, Google tracking tech*, FIERCE HEALTHCARE, July 21, 2023, https://www.fiercehealthcare.com/health-tech/regulators-warn-hospitals-and-telehealth-companies-about-privacy-risks-meta-google

[68] Dave Muoio, *Almost every hospital's homepage is sending visitors' data to third parties, study finds*, FIERCE HEALTHCARE, Apr. 3, 2023, https://www.fiercehealthcare.com/providers/almost-every-hospital-homepage-sending-visitors-data-third-parties-study-finds.

[69] Ari B. Friedman, et al., *Widespread Third-Party Tracking On Hospital Websites Poses Privacy Risks For Patients And Legal Liability For Hospitals*, HEALTH AFFAIRS, Vol. 42, No. 24, April 2023, https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.01205.

114.    This is further evidence that the data that Defendant chose to share is protected Personal Information.  The sharing of that information was a violation of Class Members' rights.

**CLASS ACTION ALLEGATIONS**

115.    Class Definition: Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and other similarly situated individuals defined as all persons in the United States who, during the class period, had their personally identifiable information or protected health information improperly disclosed to Defendants Facebook and Google as well as other third party entities, as a result of using the Defendant LeanRx's Website (the "Class" or "Nationwide Class").

116.    Plaintiff also seeks to represent a subclass consisting of Class members who, during the class period, had their personally identifiable information or protected health information improperly disclosed to Defendants Facebook and Google as well as other third party entities, as a result of using Defendant LeanRx's Website while located in California (the "California Subclass" or "Subclass").

117.    Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

118.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

119.    Excluded from the Class and Subclass are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which one of the Defendants has a controlling interest; any officer director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

120.    Numerosity/Ascertainability.  Members of the Class and Subclass are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class and Subclass Members is unknown to Plaintiff at this time; however, it is estimated that there are

hundreds of thousands of individuals in the Class and Subclass. The identity of such membership is readily ascertainable from Defendants' records.

121.    <u>Typicality</u>. Plaintiff's claims are typical of the claims of the Class and Subclass because Plaintiff used the Website and, as a result of Defendants' unlawful conduct, had her PII and PHI intercepted by Defendants Facebook and Google, without her express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class and Subclass Members.

122.    <u>Adequacy</u>. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class and Subclass Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class and Subclass. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclass.

123.    <u>Common Questions of Law and Fact Predominate/Well Defined Community of Interest.</u> Questions of law and fact common to the members of the Class and Subclass predominate over questions that may affect only individual members of the Class and Subclass because Defendants have acted on grounds generally applicable to the Class and Subclass. Such generally applicable conduct is inherent in Defendants' wrongful conduct. Questions of law and fact common to the Classes include:

(a)        Whether Defendants intentionally tapped the lines of internet communication between patients and their medical providers;

(b)        Whether LeanRx's Website contains code that permits third parties, such as Defendants Facebook and Google, to intercept patients' personally identifiable information, protected health information, and related communications;

(c)        Whether Defendants Facebook and Google are third-party eavesdroppers;

(d)        Whether Plaintiff's and Class Members' communications via the Website and the resultant interceptions thereof constitute an affirmative act of communication;

1    (e)    Whether LeanRx's conduct, which allowed Facebook, Google, and other

2  entities—unauthorized persons—to view Plaintiff's and Class Members' personally identifiable

3  information and PHI, resulted in a breach of confidentiality;

4    (f)    Whether LeanRx violated Plaintiff's, Class, and Subclass Members' privacy

5  rights by using third-party technology, such as the Facebook Pixel and the Google Analytics Pixel,

6  to allow third parties, such as Defendants Facebook and Google, to intercept Plaintiff's and Class

7  Members' online communications along with information that uniquely identified Plaintiff and the

8  Class Members;

9    (g)    Whether Plaintiff, Class, and Subclass Members are entitled to damages

10  under CIPA, ECPA, or any other relevant statute; and

11    (h)    Whether Defendants' actions violate Plaintiff's, Class, and Subclass

12  Members' privacy rights as provided by the California Constitution.

13    124.    Superiority.  Class action treatment is a superior method for the fair and efficient

14  adjudication of the controversy.  Such treatment will permit a large number of similarly situated

15  persons to prosecute their common claims in a single forum simultaneously, efficiently, and

16  without the unnecessary duplication of evidence, effort, or expense that numerous individual

17  actions would engender.  The benefits of proceeding through the class mechanism, including

18  providing injured persons or entities a method for obtaining redress on claims that could not

19  practicably be pursued individually, substantially outweighs potential difficulties in management of

20  this class action.  Plaintiff knows of no special difficulty to be encountered in litigating this action

21  that would preclude its maintenance as a class action.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511, *et seq.***
**(On Behalf of the Nationwide Class)**

26    125.    Plaintiff incorporates by reference the allegations contained in the paragraphs above

27  as if fully set forth herein.

28

1      126.    Plaintiff brings this claim on behalf of herself and members of the Nationwide

2  Class.

3      127.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional

4  interception of the content of any electronic communication. 18 U.S.C. § 2511.

5      128.    The ECPA protects both sending and the receipt of communications.

6      129.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or

7  electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter

8  119.

9      130.    The transmission of Plaintiff's PII and PHI to Defendant LeanRx's Website qualify

10  as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

11      131.    The transmission of PII and PHI between Plaintiff and Class Members and

12  Defendant LeanRx's Website with which they chose to exchange communications are "transfer[s]

13  of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part

14  by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate

15  commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. §

16  2510(12).

17      132.    The ECPA defines "contents," when used with respect to electronic

18  communications, to "include[] any information concerning the substance, purport, or meaning of

19  that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

20      133.    The ECPA defines an interception as the "acquisition of the contents of any wire,

21  electronic, or oral communication through the use of any electronic, mechanical, or other device."

22  18 U.S.C. § 2510(4).

23      134.    The ECPA defines "electronic, mechanical, or other device," as "any

24  device…which can be used to intercept a[n]…electronic communication[.]"  18 U.S.C. § 2510(5).

25      135.    The following instruments constitute "devices" within the meaning of the ECPA:

26          a.      The computer codes and programs Defendants used to track Plaintiff and

27  Class Members communications while they were navigating the Website;

28

1        b.     Plaintiff's and Class Members' browsers;

2        c.     Plaintiff's and Class Members' mobile devices;

3        d.     Defendants' web and ad servers;

4        e.     The plan the Defendants carried out to effectuate the tracking and

5 interception of Plaintiff's and Class Members' communications while they were using a web

6 browser to navigate the Website.

7       136.    Plaintiff and Class Members' interactions with Defendant LeanRx's Website are

8 electronic communications under the ECPA.

9       137.    By utilizing and embedding the tracking technology provided by Defendants

10 Facebook and Google on its website, Defendant LeanRx intentionally intercepted, endeavored to

11 intercept, and/or procured another person to intercept, the electronic communications of Plaintiff

12 and Class Members in violation of 18 U.S.C. § 2511(1)(a).

13      138.    Specifically, Defendants intercepted—in real time—Plaintiff's and Class Members'

14 electronic communications via the Trackers on the Website, which tracked, stored and unlawfully

15 disclosed Plaintiff's and Class Members' PII and PHI to Facebook and Google.

16      139.    The Defendants intercepted communications that include, but are not necessarily

17 limited to, communications to/from Plaintiff and Class Members regarding PII, including their

18 identities and PHI, including the specific medications they sought to buy, as well as information

19 related to their medical history and medical conditions.  This confidential information is then

20 monetized for targeted advertising purposes, among other things.

21      140.    By intentionally disclosing or endeavoring to disclose Plaintiff's and Class

22 Members' electronic communications to Defendants Facebook and Google through the Trackers

23 while knowing or having reason to know that the information was obtained through the

24 interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant

25 LeanRx violated 18 U.S.C. § 2511(1)(c).

26      141.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class

27 members' electronic communications, while knowing or having reason to know that the

28

information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

142. Defendants intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, CIPA, HIPAA, and invasion of privacy, among others.

143. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendants violated CIPA, HIPAA, and Article 1 of California's Constitution.

144. Plaintiff's information that Defendant LeanRx disclosed to Defendants Facebook and Google are PII and PHI, and Defendants violated Plaintiff's and Class Members' expectations of privacy. Defendants specifically used the Trackers to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

145. Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person ... without authorization" from the patient.

146. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

147. Defendant LeanRx's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookies associated with specific patients without patient authorization and disclosed individually identifiable health information to Defendants Facebook and Google as well as others.

148. Defendant LeanRx's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant LeanRx's use of Defendants' Facebook and Google source

code was for Defendant LeanRx's commercial advantage to increase revenue from existing customers and gain new customers. The unauthorized disclosure of individually identifiable health information is a criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health information. Defendant LeanRx intentionally violated 42 U.S.C. 1320d-6 by intentionally disclosing individually identifiable health information without authorization.

149.    Defendant LeanRx's conduct also constituted a violation of HIPAA, particularly 42 U.S.C. § 1320d-6, which is a criminal offense punishable by fine or imprisonment with increased penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain." LeanRx intentionally violated the enhanced penalty provision of 42 U.S.C. § 1320d-6 by acquiring the individually identifiable health information "with intent to sell transfer or use" it for "commercial advantage [or] personal gain."

150.    Defendants' conduct violated the California Confidentiality of Medical Information Act in that:

a.    Defendants accessed Plaintiff's and Class Members' computing devices and data as part of a deception and without their authorization, including through placement of cookies as well as use of the Trackers which commanded Plaintiff's and Class Members' computing devices to send identifiers and the content of communications with LeanRx simultaneously to Defendants LeanRx, Facebook, and Google, as well as others;

b.    Defendants obtained use of or and removed data from Plaintiff's and Class Members' computing devices as part of a deception and without their authorization, including through placement, and use of cookies and the Trackers that commanded Plaintiff's and Class Members' computing devices to send identifiers and the content of communications with LeanRx simultaneously to Defendants LeanRx, Facebook, and Google, as well as others; and

c.    Defendants accessed or caused to be accessed the Plaintiff's and Class Members' computing devices and data, and thereby obtained control over the Plaintiff's and Class

Members' property in the form of their computing devices and right to control access and use of their personal health information as part of a deception and without their authorization, including through placement of cookies and the Trackers that commanded Plaintiff's and Class Members' computing devices to send identifiers and the content of communication with LeanRx simultaneously to Defendants LeanRx, Facebook, and Google, as well as others.

151.    Defendants' conduct violated the California Comprehensive Computer Data Access and Fraud Act when it knowingly and without Plaintiff's or Class Members' authorization inserted cookies on Plaintiff's and Class Members' computing devices.

152.    The cookies, which constitute programs, commanded Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with LeanRx simultaneously to Defendants LeanRx, Facebook, and Google, as well as others.

153.    Defendants knew or had reason to know that the cookies would command Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with LeanRx simultaneously to Defendants LeanRx, Facebook, and Google, as well as others

154.    Defendants knew or had reason to know that its use of cookies would cause Plaintiff and Class Members to suffer a loss, including:

a.    The interruption or preclusion of Plaintiff's and Class Members' ability to communicate with their health care providers on the Website;

b.    The diminution in value of Plaintiff's and Class Members' protected health information;

c.    Plaintiff's and Class Members' inability to use their computing devices for the purpose of communicating with their health care providers; and

d.    The loss of privacy due to Defendants making sensitive and confidential information such as medical intakes, medication orders, and doctor appointment that Plaintiff and Class Members intended to remain private no longer private.

155.    Defendants took something of value from Plaintiff and Class Members and derived benefits therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value.

156.    Defendants were not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

157.    Plaintiff and Class Members did not authorize Defendants to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy.  Plaintiff and Class Members, all of whom are users of the Website, had a reasonable expectation that Defendant LeanRx would not redirect their communications to Defendants Facebook and Google without their knowledge or consent.

158.    The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

159.    As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2511, *et seq*. under 18 U.S.C. § 2520.

## COUNT II
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 631
### (On Behalf of the California Subclass)

160.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the California Subclass.

139.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct."  *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a Plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or

instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

140.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

161.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications … "  Cal. Penal Code § 630.

162.    A person violates California Penal Code § 631(a), if:

by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including

the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained …

Cal. Penal Code § 631(a).

163.    Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

164.    To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

165.    At all relevant times, Defendant LeanRx aided, agreed with, and conspired with third parties, including, Defendants Facebook and Google, to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website.  These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

166.    Defendant LeanRx, when aiding and assisting the wiretapping by the above-described third parties, including Defendants Facebook and Google, intended to help those third parties learn some meaning of the content in the URLs and the content the visitor requested.

167.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, Defendants' Facebook Pixel and Google Analytics Pixel fall under the broad catch-all category of "any other manner":

a.    The computer codes and programs Defendants Facebook and Google and other third parties used to track Plaintiff and Class Members' communications while they were navigating the Website;

b.    Plaintiff's and Class Members' browsers;

c.    Plaintiff's and Class Members' computing and mobile devices;

d.    Facebook and Google's web and ad servers;

e.      The web and ad-servers from which Facebook, Google, and other third parties tracked and intercepted the Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Website;

f.      The computer codes and programs used by Facebook, Google, and other third parties to effectuate its tracking and interception of the Plaintiff's and Class Members' communications while they were using a browser to visit Defendant LeanRx's Website; and

g.      The plan Facebook, Google, and other third parties carried out to effectuate their tracking and interception of the Plaintiff's and Class Members' communications while they were using a web browser to visit Defendant LeanRx's Website.

168.    The user communication information that Defendant LeanRx permitted Defendants Facebook and Google and other third parties to intercept via Defendant LeanRx's integration of the Facebook Pixel, the Google Analytics Pixel and other code, including medical intake information, medication information, and doctor appointment information constitutes PHI.

169.    As demonstrated hereinabove, Defendant LeanRx violated CIPA by aiding and permitting third parties, including Defendants Facebook and Google, to receive its users' online communications through its Website without their consent.

170.    As a result of the above violations, Defendants are liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages.  Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

171.    Under the statute, Defendants are also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendants in the future.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT III**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**
**(On Behalf of the California Subclass)**

141.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

142.    Plaintiff brings this claim against Defendants individually and on behalf of the California Subclass.

143.    CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

144.    The Trackers are an "electronic amplifying or recording device."

145.    At all relevant times, Defendant LeanRx assisted Defendants Facebook and Google in eavesdropping upon and recording confidential medical communications of Plaintiff and California Subclass members, on the one hand, and Defendant, on the other.

146.    When communicating with Defendant LeanRx, Plaintiff and California Subclass members had an objectively reasonable expectation of privacy, based on HIPAA.  Thus, Plaintiff and California Subclass members did not reasonably expect that anyone other than Defendant LeanRx would be on the other end of the communication, and that other, third-party entities, like Defendants Facebook and Google, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential medical communications of Plaintiff and California Subclass members.

147.    Indeed, Plaintiff and California Subclass members using the Website disclose their confidential medical information, including their interest in obesity medications.  The sensitive nature of this information enhances their reasonable expectation of privacy because such sensitive information should not be disclosed to, nor intercepted by, third parties like Defendants Facebook

and Google.  *See Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 580 (N.D. Cal. 2025) ("Here …

plaintiffs have pleaded and offered common proof of their allegations that their highly personal

health information was disclosed without their consent, along with data that could be used to

identify individuals.").

148.    Plaintiff and California Subclass members did not consent to any of Defendants'

actions.  Nor have Plaintiff or California Subclass members consented to any intentional use of an

electronic amplifying or recording device to eavesdrop upon and record the confidential medical

communications of Plaintiff and California Subclass members.

149.    The wiretapping of Plaintiff and California Subclass members occurred in

California, where Plaintiff and California Subclass members accessed LeanRx's Website and

where Defendants Facebook and Google's Trackers, as enabled by Defendant LeanRx, intercepted

Plaintiff's and the California Subclass members' communications.

150.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass members

have been injured by Defendants' violations of CIPA § 632(a), and each seeks statutory damages

of $5,000 for each of Defendants' violations of CIPA § 632(a).

## COUNT IV
**Violation of the Comprehensive Computer Data and Access and Fraud Act
Cal. Penal Code § 502, *et seq.*
(On Behalf of the California Subclass)**

151.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

152.    Plaintiff brings this claim against Defendants individually and on behalf of the

California Subclass.

153.    The California Comprehensive Computer Data Access and Fraud Act ("CDAFA")

was enacted to provide protection from "tampering, interference, damage, and unauthorized access

to lawfully created computer data and computer systems."  Cal. Penal Code § 502(a).

154.    CDAFA affords a private right of action to owners of computers, systems, networks,

programs, and who suffer damage or loss as a result of a violation of the Act.  *See* Cal. Penal Code

§ 502(e)(1).

155. Relevant here, Cal. Penal Code § 502 imposes civil liability on anyone who:

(c)(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;

(c)(3) Knowingly and without permission uses or causes to be used computer services.

(c)(6) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section.

(c)(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

(c)(8) Knowingly introduces any computer contaminant into any computer, computer system, or computer network.

156. Under § 502 of the California Penal Code "[f]or purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Cal. Penal Code § 502(j).

157. "Computer services" under the CDAFA "includes, but is not limited to, computer time, data processing, or storage functions, internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(4).

158. "Computer network" is "any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers connected by telecommunication facilities." Cal. Penal Code § 502(b)(2).

159. "Computer system" is "a device or collection of devices, including support devices…one or more of which contain computer programs, electronic instructions, input data, and

output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control."  Cal. Penal Code § 502(b)(5).

160.    "Data" is defined as "a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions" that "may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device."  Cal. Penal Code § 502(b)(8).

161.    "Computer contaminant" is defined as "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consumer computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network."  Cal. Penal Code § 502(b)(12).

162.    Defendant's conduct, described herein, violates Cal. Penal Code §§ 502(c)(2), (3), (4), (6), (7), and (8).

163.    Plaintiff and California Subclass members were the owners or lessees of the computers, computer systems, computer networks, and data described herein.

164.    Defendant LeanRx violated Cal. Penal Code § 502(c)(2) by knowingly accessing and without permission taking, copying, analyzing, and using Plaintiff's and the California Class members' data and sharing it with Defendants Facebook and Google.

165.    In violation of Cal. Penal Code § 502(c)(8), Defendants knowingly introduced and continue to introduce computer contaminants into Plaintiff's and the California Subclass members' computer, computer system, or computer network.  Among other things, Defendants introduced the Trackers.  The Trackers are designed to, and do, self-propagate to contaminate users' computers, computer systems, and computer networks to record and transmit data that would not otherwise be transmitted or recorded in the normal operation of the computers, computer systems, and computer

networks.  The Trackers usurp the normal operation of Plaintiff's and California Subclass' computing devices because they supplant Plaintiff's and California Subclass' choices in how those devices and their resources are used.

166.    In violation of §§ 502(c)(2)-(3), (6)-(8), Defendants knowingly took, copied, accessed, used, caused to be used, altered, and added Plaintiff's and California Subclass' data, computers, computer services, and computer networks.  Among other things, Defendants knowingly introduced its technologies into Plaintiff's and California Subclass' computers, computer systems, and computer networks and provided themselves and other entities the means of accessing Plaintiff's and California Subclass' computers, computer systems, and computer networks in violation of CDAFA by developing the technologies and encouraging and providing the means for the Website and other online services to use and deploy them on their platforms.

167.    Defendants make use of Plaintiff's and California Subclass members' valuable data to obtain money through advertising

168.    Defendants' use of Plaintiff's and California Subclass members' data is wrongful and unlawful, as described herein

169.    Plaintiff and California Subclass members suffered economic injury because Defendant LeanRx caused numerous third parties, including Defendants Facebook and Google, to unjustly profit from Plaintiff's and California Subclass members' personal information and online activity.

170.    It would not be equitable to allow Defendants to keep those profits, which were generated by their violations of Plaintiff and California Subclass member's privacy interests.

171.    As a direct and proximate result of Defendants' unlawful conduct within the meaning of Cal. Penal Code § 502, Defendants have caused losses to Plaintiff and the California Subclass members in an amount to be proven at trial.

172.    Plaintiff, on behalf of herself and the California Subclass, seeks compensatory damages and/or disgorgement in an amount to be proven at trial, and declaratory, injunctive, or other equitable relief.

173. Plaintiff and members of the California Subclass are entitled to punitive damages because Defendants' violations were willful, and, upon information and belief, Defendants are guilty of oppression, fraud, or malice within the meaning of Cal. Civil Code § 3294 such that Plaintiff and Class Members are entitled to recovery of exemplary damages under Cal. Penal Code § 502(e)(4).

174. Plaintiff and Class Members are also entitled to recover reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

## COUNT V
### Invasion Privacy Under California's Constitution
### (On Behalf of the California Subclass)

175. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

176. Plaintiff and California Subclass members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff and California Subclass members' knowledge or consent.

177. At all relevant times, by using the Defendants' Facebook Pixel and Google Analytics Pixel, among other third-party code, to record and communicate patients' FIDs, IP addresses, and device identifiers alongside their confidential medical communications, Defendant LeanRx intentionally invaded Plaintiff's and the California Subclass members' privacy rights under the California Constitution.

178. Plaintiff and the California Subclass members had a reasonable expectation that their communications, identity, health information and other data would remain confidential and that LeanRx would not install wiretaps on the Website.

179.    Plaintiff and the California Subclass members did not authorize LeanRx to record and transmit Plaintiff's and the California Subclass members' private medical communications alongside their personally identifiable health information to Defendants Facebook and Google.

180.    This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

181.    Accordingly, Plaintiff and the California Subclass members seek all relief available for invasion of privacy claims under California's Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    For a determination that this action is a proper class action;

b.    For an order certifying the Class and Subclass, naming Plaintiff as representative of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

c.    For an order declaring that Defendants' conduct violates the statutes referenced herein;

d.    For an order finding in favor of Plaintiff, the Class, and the Subclass on all counts asserted herein;

e.    For an award of compensatory damages, including statutory damages where available, to Plaintiff, Class, and Subclass Members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

f.    For punitive damages, as warranted, in an amount to be determined at trial;

g.    For an order requiring Defendants to disgorge revenues and profits wrongfully obtained;

h.    For prejudgment interest on all amounts awarded;

i.    For injunctive relief as pleaded or as the Court may deem proper;

1          j.       For an order awarding Plaintiff, the Class, and the Subclass their reasonable attorneys' fees and expenses and costs of suit; and

k.       For an order granting Plaintiff, Class, and Subclass Members such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff on behalf of herself and the proposed Class and Subclass, demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: January 26, 2026          Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   */s/ L. Timothy Fisher*
        L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Daniel S. Guerra (State Bar No. 267559)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
      dguerra@bursor.com
      sbogdanovich@bursor.com

*Attorneys for Plaintiff and the Putative Class*